## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YAEL CANAAN, | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| CARNEGIE MELLON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

1.      Carnegie Mellon University ("CMU"), located in Pittsburgh, Pennsylvania, publicly touts its commitment to fighting discrimination.  According to its Statement of Assurance, CMU "does not discriminate in . . . administration of its programs or activities on the basis of race, color, national origin, sex, handicap or disability, age, sexual orientation, gender identity, religion, creed, ancestry, belief, veteran status, or genetic information."[1]  But as to its Jewish students, these promises are false.  CMU nurtures and protects a culture of antisemitism and discrimination against Jews.

2.      Plaintiff Yael Canaan is a Jewish woman of Israeli descent who attended the School of Architecture at CMU from 2018 to 2023.  During her five years as a student at CMU, Canaan endured a cruel campaign of antisemitic abuse by CMU faculty and administration.  Mary-Lou Arscott, a professor at the School of Architecture, told Canaan in class that her studio project should have focused on "what Jews do to make themselves such a hated group."  The same professor later emailed Canaan a link to a violently antisemitic blog, even brazenly cc'ing CMU's

---

[1]  *Statement of Assurance*, CARNEGIE MELLON UNIVERSITY, https://www.cmu.edu/policies/administrative-and-governance/statement-of-assurance.html (last visited Dec. 8, 2023).

Chief Diversity Officer and the Vice Provost of Diversity, Equity and Inclusion—administrative officers charged with protecting students from discrimination.

3.     After Canaan complained, other professors turned on her in retaliation.  They told her that she needed to stop "acting like a victim" and that they would not "be an advocate for the Jews."  The faculty subjected her to a systemic campaign of hostility, including limiting her class time, ceasing direct one-on-one instruction provided to every other student, and omitting her project—and only hers—from a disseminated book of the studio work created by all the other students in the class.  One professor told her she had no alternative other than to attend studio class which Arscott frequently joined, knowing that Canaan feared her and had previously submitted complaints.  The only "compromise" offered to Canaan to avoid Arscott was for her to present her studio project at the beginning of the class—which is four hours long—and then leave as soon as she was done.  The school thereby shut Canaan out of the most important class in her academic program, and publicly humiliated her before her peers.

4.     No university official or faculty member took any action to protect her, accommodate her, or to punish her abusers.   Canaan apprised the appropriate university administrators in real time, in writing, of each offense.  These administrators included: the Chief Diversity Office, the Director of the Office of Diversity, Equity and Inclusion, the Dean of Students, and the Title IX Coordinator.  These are the officials whose job it is to protect students from abuse and discrimination based on their religion or ethnic background.  But for a Jewish student reporting clearly antisemitic incidents causing fear and distress, these officials stonewalled, dissuaded Canaan from filing a formal complaint, and did nothing to protect Canaan from the torment and hostile environment they saw with their own eyes.  It bears repeating that Arscott actually cc'd the Vice Provost for DEI and Chief Diversity Officer on the email to Canaan

attaching the antisemitic blog.  These officials did not reprimand or punish or even investigate any of the faculty involved in the antisemitic harassment—a direct violation of CMU's policies and procedures, and federal law.

5.      As a result of the harassment, public humiliation, and isolation from other students, Canaan developed, for the first time in her life, chronic, debilitating, and nausea-inducing migraines, triggered by stress.  She suffered dozens of these migraines every month.  Canaan also developed severe clinical depression, experienced grave emotional distress, was cheated out of the education for which CMU charges hundreds of thousands of dollars in tuition, and saw her career materially damaged just as it was beginning.  She had to see doctors for her physical ailments and a therapist to help her emotionally manage the hostile educational environment, and accumulated substantial medical bills.  All the while, the perpetrators of the antisemitic harassment—and the Administration which protected them—went on as normal.

6.      By this action, Canaan seeks redress for the damages she suffered as a result of the antisemitic environment fostered by CMU.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over Counts I, II, and III of this action pursuant to 28 U.S.C. § 1331 because these claims arise under federal law.

8.      This Court has supplemental subject matter jurisdiction over Counts IV and V of this action pursuant to 28 U.S.C. § 1367(a) because these are so related to the federal claims in Counts I, II, and III that they form part of the same case or controversy under Article III of the United States Constitution.

9.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over CMU because it is located in and conducts business in Pennsylvania.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because CMU is located in the Western District of Pennsylvania, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Pennsylvania.

## PARTIES

12.     Yael Canaan is a 23-year-old American of Israeli ancestry and a graduate of CMU's School of Architecture ("SoA").  She attended CMU from 2018 to 2023.  She is a resident of the state of New Jersey, and is a citizen of the United States.  She is Jewish and her parents and siblings were born in Israel.  She is a citizen of New Jersey for purposes of federal subject matter jurisdiction.

13.     CMU is a private university incorporated and located in Pittsburgh, Pennsylvania and is a citizen of Pennsylvania for purposes of federal subject matter jurisdiction.  CMU costs $83,697 per year to attend.[2]  CMU has an endowment of approximately $3 billion, and over the course of Canaan's attendance, it received a total of approximately $1.753 billion in federal

---

[2] *2023-2024 Tuition & Fees*, CARNEGIE MELLON UNIVERSITY,  https://www.cmu.edu/admission/costs-aid/tuition-and-fees  (last visited Dec. 8, 2023).

funding.[3]  From 2004 to 2019 CMU has reported funding from Qatar of $591,571,726 and has a campus in Doha, Qatar.[4]  5.5 percent of CMU's undergraduate students are Jewish.[5]

## FACTUAL ALLEGATIONS

### A.    Canaan Encounters the First Signs of CMU's Antisemitic Culture

14.     Canaan began her studies at CMU in August 2018.  During her first three years of school, she experienced several jarring incidents that smacked of antisemitism.  In Canaan's very first semester at CMU, a terrorist murdered 11 Jews, and critically injured two more, while they were engaged in Shabbat prayers at the nearby Tree of Life Synagogue down the road from CMU.[6]  It is widely considered to be the deadliest antisemitic attack in American history.[7]

15.     The CMU community gathered on campus for a memorial service for the Tree of Life Synagogue victims on October 29, 2018.  Canaan asked Arscott, her professor at the time, for an extension on a homework assignment, so that she could attend that memorial service.  Arscott denied her request without explanation.  Canaan was unable to attend the memorial service as a result.

---

[3] *Find a Recipient Profile*, U.S. DEP'T OF TREASURY, https://www.usaspending.gov/recipient (last visited Dec. 8, 2023).

[4] Charles Asher Small & Michael Bass, *Volume Two: Examining Undocumented Foreign Funding of American Universities: Implications for Education and Rising Antisemitism*, INSTITUTE FOR THE STUDY OF GLOBAL ANTISEMITISM AND POLICY, https://isgap.org/wp-content/uploads/2020/09/ISGAP-Report-Volume-II.pdf (Sept. 2020)

[5] HILLEL INTERNATIONAL, CARNEGIE MELLON UNIVERSITY https://www.hillel.org/college/carnegie-mellon-university/ (last visited Dec. 8, 2023).

[6] *Jury Recommends Sentence of Death for Pennsylvania Man Convicted for Tree of Life Synagogue Shooting*, U.S. DEP'T OF JUST. (Aug. 2, 2023), https://www.justice.gov/opa/pr/jury-recommends-sentence-death-pennsylvania-man-convicted-tree-life-synagogue-shooting.

[7] Isabel Fattal, *A Brief History of Anti-Semitic Violence in America*, THE ATLANTIC (Oct. 28, 2018), https://www.theatlantic.com/politics/archive/2018/10/brief-history-antisemitic-violence-america/574228/.

16.    In May 2021, the president of a student group posted in a 5,700-member Facebook group a message explicitly calling out the Jewish community and involving them in the tensions and aggressions related to a battle that was then happening in Israel and Gaza.  The post shared screenshots of internal emails from the campus Jewish community that made it easy to identify Canaan and other Jewish students because of their affiliation with Jewish organizations on campus. This incident frightened Canaan and other Jewish community leaders, and put their physical safety at risk.

17.    On May 19, 2021, following the antisemitic incidents described above, Canaan wrote an email to Gina Casalegno, CMU's Dean of Students, and Farnam Jahanian, the President of CMU, expressing her concerns over the antisemitism on CMU's campus.  She noted that Jewish students "no longer feel safe on this campus."  Casalegno and Mandy Best (who was copied on Casalegno's response and who helps lead CMU's Religious and Spiritual Life initiatives) responded with expressions of their "sympathies" and held a Zoom meeting for students to express their feelings, but no action was taken.

**B.    Arscott Makes Antisemitic Remarks to Canaan in Studio**

18.    Nothing Canaan had experienced before, however, prepared her for what would happen in her studio class.

19.    Studio classes are integral to an architecture student's education.  They are required every semester.  In studio classes, students receive hands-on, practical instruction in architectural design, making models and applying what they have learned in their other classes.  Throughout the duration of her intensive architecture program, Canaan was required to take 8-9 hours of studio per week.

20.     Typically, architecture studio classes involve small groups, open discussions, and one-on-one meetings with professors.  Feedback—whether class-wide, small group, or individual professor feedback—is a critical component of the class and an architecture student's education.

21.     Canaan was well equipped to handle such a rigorous program.  Erica Cochran Hameen, SoA's Director of DEI and Canaan's professor in a design studio course and National Organization of Minority Architects Students faculty advisor, referred to Canaan as smart, diligent, mature, and talented, the perfect student, and a wonderful person.

22.     On May 5, 2022, Canaan had the final review for her studio class, where the students presented the projects they had worked on over the course of the entire semester.  For her studio project, Canaan created a model about a neighborhood in New York City.  After spending the entire semester working diligently on it, Canaan was looking forward to the opportunity to present her work.

23.     The model she created focused on the conversion of a public space into a private space through an eruv.  An eruv is a small wire boundary that symbolically extends the private domain of devoutly religious Jewish households into public areas, permitting activities within it that are normally forbidden in public on the Sabbath.  It is an integral feature of many neighborhoods with large devout Jewish populations.

24.     Professor Mary-Lou Arscott—the same Professor who had inexplicably refused Canaan an extension to attend the Tree of Life memorial service—approached her in class during the final review.  Arscott is a professor and Associate Head for Design Fundamentals at the SoA. Arscott has spent professional time in Qatar—which shelters and protects antisemitic, anti-Jewish

and anti-Israel terrorist organizations.  CMU has reported funding from Qatar of $591,571,726 and has a campus in Doha, Qatar.[8]

25.     In response to questioning, Canaan began explaining the concept of an eruv to Arscott, but Arscott cut her off.  Arscott said—completely out of the blue—that the wall in the model looked like the wall Israelis use to barricade Palestinians out of Israel.  This shocked Canaan, who then tried to regain her composure and finish her presentation.  But when Canaan finished, Arscott said only that Canaan's time would have been better spent if she had instead explored "what Jews do to make themselves such a hated group."

26.     Canaan immediately approached her studio professor at the time to report the incident, but the professor simply told her not to worry because Arscott would not be grading her. Canaan left class demoralized, shaken, and afraid.

## C.     Canaan Promptly Reports the Antisemitism and CMU Fails to Address It

27.     After collecting herself, Canaan contacted CMU administration later that same day. She texted and then spoke by phone with Erica Cochran Hameen, SoA's Director of DEI, to report what happened.

28.     Canaan first reached out by text, and minced no words: "Hi Erica, I know this is probably not what you want to hear right now, but I had a professor be blatantly antisemetic [sic] during my review today."

29.     Shortly thereafter, Canaan spoke to Hameen by phone.  Hameen claimed she was shocked and appalled by the incident, and assured Canaan that she would speak to Arscott.  To

---

[8] Charles Asher Small & Michael Bass, *Volume Two: Examining Undocumented Foreign Funding of American Universities: Implications for Education and Rising Antisemitism*, INSTITUTE FOR THE STUDY OF GLOBAL ANTISEMITISM AND POLICY, https://isgap.org/wp-content/uploads/2020/09/ISGAP-Report-Volume-II.pdf  (Sept. 2020)

Canaan's knowledge, however, Hameen never did so.  No one from CMU's DEI Office ever followed up.

30.      A few days later, after Hameen failed to follow up with Canaan or take any other action, Canaan sent an email to CMU's Dean of Students, Gina Casalegno, detailing Arscott's antisemitic comments directed at Canaan, and she copied CMU's Chief Diversity Officer and Vice Provost for DEI, Wanda Heading-Grant.  Canaan provided a clear report of the incident and demanded a thorough investigation and meaningful response.

31.      Two days later, on May 14, 2022, Casalegno responded to Canaan, writing dismissively that she was sorry to read her "reflections."

32.      Casalegno then referred Canaan to her secretary for scheduling and Canaan set up a meeting for May 18.  Casalegno broke that appointment, however, offering as an excuse only that her secretary did not keep Casalegno's schedule accurately.

33.      The May 18 meeting went forward on Zoom nonetheless with Heading-Grant, although Heading-Grant showed up late and unprepared to address the issue.  On that Zoom, Canaan told Heading-Grant that she wanted two remedies from CMU: (1) an apology from Arscott and (2) antisemitism training for Arscott, which included training on the connection between anti-Zionism and antisemitism.  Heading-Grant said she would be in touch to follow up.

34.      A month later, on June 13, 2022, Canaan met with Casalegno over Zoom in a further effort to seek action in response to her complaint.  Casalegno only offered to go for a "casual walk" with Arscott, who Canaan learned was Casalegno's close personal friend.  Canaan indicated that a "casual walk" was not sufficient redress, but Casalegno responded only that she would follow up with Canaan after the "casual walk."

35.     On July 28, 2022, Casalegno updated Canaan only to tell her that she had not yet talked to Arscott, but that she would do so at some point in August.

36.     On August 18, 2022, Casalegno emailed Canaan and reported that she had a thoughtful conversation with Arscott, and stated that Heading-Grant would be in touch to arrange a meeting between Canaan and Arscott, which Canaan understood would be for Arscott to apologize.

**D.     Arscott Sends an Antisemitic Blog and Canaan, for the Second Time, Immediately Reports Arscott's Antisemitism to CMU**

37.     Notwithstanding Casalegno's promise, Canaan heard nothing for over two months. Finally, the administration scheduled a Zoom meeting with Canaan and Arscott, for November 2, 2022.  This was nearly *six months* after Canaan reported the incident.  Casalegno said Heading-Grant would "facilitate" the meeting.  But Arscott refused to apologize and expressed no remorse for her conduct.  She stated to Canaan only, "I'm sorry you felt that way."  Canaan realized that the DEI Office had done nothing to "facilitate" or prepare Arscott in any way, or even to inform Arscott about what Canaan reported.  Indeed, Heading-Grant said and did nothing on the Zoom at all.

38.     Then Arscott struck again.  Shortly after the Zoom, Arscott sent Canaan and Heading-Grant an email with a link to an anti-Jewish, anti-Israel blog called The Funambulist that she had referenced on the Zoom.  Arscott urged Canaan to read The Funambulist's content at the link that she shared because it provided her with "insightful … perspective."

39.     The Funambulist regularly publishes antisemitic and anti-Israel articles, including articles that promote pictures of terrorist organizations throwing Molotov cocktails at Jewish

people and that decry the "Judaization" of a region of Israel.[9]  It is filled with article titles that refer to "*Israeli Apartheid*" and "*Israeli Police: The Daily Practice of Collective Punishment Against Palestinians*."  A sample passage in a Funambulist article states: "[Y]ou never make concessions to the oppressor.  If you're going to get punished, and you might, if you piss off Zionists, it's always a possibility, right, then stare the oppressor in the face, and take whatever punishment is coming.  Don't concede, don't start apologizing….The Palestinians aren't backing down, nor should we….[we] do not make concessions to the oppressor."[10]

40.     The Funambulist's content falls squarely within the International Holocaust Remembrance Alliance's definition of antisemitism,[11] which has been adopted by 43 countries, including the United States.[12]

41.     Canaan promptly sent an email to Heading-Grant and Casalegno to report Arscott's email and the attached link to The Funambulist.  Canaan noted that Arscott's email made her

---

[9] Danah Abdulla, *A Platform for Third World Solidarity: The Popular Front for the Liberation of Palestine Bulletin*, THE FUNAMBULIST (Feb. 28, 2019), https://thefunambulist.net/magazine/22-publishing-struggle/platform-third-world-solidarity-popular-front-liberation-palestine-bulletin-danah-abdulla; Aamer Ibraheem, *Emptying the Jawlan, Constructing the Apartheid*, THE FUNAMBULIST (Nov. 3, 2017), https://thefunambulist.net/magazine/14-toxic-atmospheres/guest-columns-emptying-jawlan-constructing-apartheid-aamer-ibraheem.

[10] Steven Salaita, *Languages of Colonialism and Resistance in Palestine*, THE FUNAMBULIST (Apr. 8, 2022), https://thefunambulist.net/podcast/the-funambulist-podcast-steven-salaita-languages-of-colonialism-and-resistance-in-palestine.

[11] The definition is: "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities." *What is antisemitism?*, INT'L HOLOCAUST REMEMBRANCE ALLIANCE, https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism (last visited Dec. 8, 2023).  The International Holocaust Remembrance Alliance provides several illustrative examples of contemporary antisemitism, including, among others, "[d]enying the Jewish people their right to self-determination, e.g., by claiming the existence of a State of Israel is a racist endeavor."  *Id.*  This definition and the examples have been adopted by the U.S. Department of State. *Defining Antisemitism*, U.S. DEP'T OF STATE, https://www.state.gov/defining-antisemitism/ (last visited Dec. 8, 2023).

[12] *Information on endorsement and adoption of the IHRA working definition of antisemitism*, INT'L HOLOCAUST REMEMBRANCE ALLIANCE, https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism/adoption-endorsement (last visited Dec. 8, 2023).

extremely upset and demonstrated that Arscott did not have any remorse.  She also stated that such an incident leads Jewish students to being uncomfortable on campus.

42.     Heading-Grant responded once again in language that ignored the problem and discredited the complaint.  She noted that she was "sorry" and that Canaan was "clearly … upset." Even though Heading-Grant was copied on Arscott's initial email days earlier, Heading-Grant claimed that she did not have any context.  Canaan reminded Heading-Grant that Arscott copied her on the original email that she sent to Canaan with the link to The Funambulist.

43.     Heading-Grant did not reply again until November 13, a week after Canaan's email reporting Arscott's antisemitic email.  Despite being the Vice Provost for DEI and Chief Diversity Officer, and despite herself having been cc'd on the email containing antisemitic content, Heading-Grant said there was nothing she could do.  Ignoring unmistakable, blatant abuse of a student by a professor, she said that if Canaan felt aggrieved—which Heading-Grant presumably did not believe was true or legitimate—Canaan should contact CMU's Office for Institutional Equality and Title IX.

**E.     The Title IX Office Strings Canaan Along**

44.     Canaan indicated her desire to speak with Elizabeth Rosemeyer, CMU's Title IX Coordinator and Assistant Vice Provost for DEI, and set up a meeting with her for November 21, 2022.

45.     CMU's Title IX Office accepts complaints of "sexual misconduct [and] other types of discrimination."[13]   CMU allows students to make either formal or informal complaints of

---

[13] *Office for Institutional Equity & Title IX, Resource Guide & Information* at 2, CARNEGIE MELLON UNIVERSITY (updated Feb. 2023), https://www.cmu.edu/title-ix/iex---resource-guide-updated-2023.pdf.

discriminatory conduct through its Title IX Office.  According to CMU's Title IX Office Resource

Guide, the difference between a formal and informal complaint is as follows:

> The Office accepts reports of prohibited conduct from anyone at any
> time.  A report is information provided to the Office regarding one
> or more incidents of prohibited conduct.  Whether the person
> making the report decides to pursue an investigation or other
> resolution, or to not take any further action, is ultimately up to their
> own discretion.  A Formal Complaint is a signed, written or typed
> document, requesting that the University initiate a formal
> investigation into the alleged prohibited misconduct.[14]

46.     At the meeting, Canaan was sobbing and recounted, yet again, her experience with

Arscott and the CMU administration.  In response, Rosemeyer aggressively discouraged Canaan

from filing a formal complaint, which would have triggered an investigation of Arscott, the DEI

Office's failure to address the misconduct, and the systemic culture of antisemitism at CMU.

Rosemeyer said that a formal complaint would take too long and would require extensive work on

both of their parts.  Rosemeyer said that there would have to be interviews taken, testimony given,

and would involve lots of processing time.  Rosemeyer also said there would be no resolution prior

to Canaan's graduation, and the most that Canaan could hope to see was a slap on the wrist for

Arscott.  Canaan gave in to Rosemeyer's pressure, but Canaan reiterated her request for an apology

from Arscott and training for Arscott on antisemitism.

47.     Several weeks later—*seven months* after Canaan's initial report—Rosemeyer

admitted that she had not even raised the topic of an apology with Arscott.

## F.     Other Professors Circle the Wagons Against Canaan Because of Her Reports

48.     In her final year at CMU, Canaan had two professors, each of whom were beholden

to Arscott: Theodossis Issaias and Priyanka Bista.  Issaias was a personal friend of Arscott, and

---

[14] *Id.* at 3.

Bista owed her employment at CMU to Arscott.  Initially, Canaan had a positive and supportive working relationship with both Issaias and Bista.  However, after they learned that Canaan had reported Arscott's antisemitic actions, they embarked on a campaign of retaliation against Canaan.

49.    Over the course of the fall 2022 semester, Canaan reached out to Issaias to discuss the antisemitic treatment she had endured, seeking his assistance and guidance.

50.    Issaias did not take Canaan seriously.  Soon after Canaan confided in Issaias about Arscott's antisemitic statements and actions, Issaias invited the class to a party at Arscott's home. When Canaan mentioned how disturbed she was that Isaaias would choose Arscott's home as a venue for a class party, Issaais told Canaan that "breaking bread is a process of reconciliation" and that Canaan needed to stop "acting like a victim" and that he was "not there to fight her battles for her."  He complained that Canaan was "calling all of us antisemites," and stated that he "cannot be an advocate for the Jews."

51.    Issaias thereafter refused Canaan the one-on-one attention that he gave to all of her classmates.  One-on-one attention is a critical aspect of the architecture program's practical skills studio coursework.  Canaan lost the opportunity for individualized feedback on her projects, which was a core part of the curriculum.

52.    Issaias also became aggressive towards Canaan in front of her classmates.  The hostility was so obvious to her classmates that several of them asked Canaan what she did to cause Issaias to treat her so poorly.

53.    Having previously praised Canaan's work product, Issaias sharply turned on her and went so far as to publicly blame Canaan for another student's problems in the studio, even on a project that she was completely uninvolved with.  He subjected her to continual public abuse,

telling Canaan that she had failed him all semester, and abruptly walking out of their one-on-one meetings whenever Canaan tried to seek his guidance.

54.     Issaias gave Canaan a lower grade than her classmates in the same group for a group project.  This is a red flag for discrimination because, as one would expect, participants in a group project in studio classes are generally graded uniformly.

55.     When Canaan requested feedback on her ideas for her final project in Issaias's class, Issaias refused to help or talk to her, except for occasionally commenting on how "unthoughtful" her work was, damaging her ability to learn and develop her skills.

56.     For almost the entire month of December, Issaias refused to work with Canaan, skipping over her when he would work with other students for significant blocks of time.

57.     On December 19, 2022, Issaias compiled a booklet presenting all of his students' final projects from the semester to be distributed to students, professors, and community members to help market the students' skills in hopes of developing their portfolios and job prospects.  Issaias included the work of every student in the class—except for Canaan.  This was publicly humiliating for Canaan.  Also, by excluding Canaan's work from the booklet, Issaias materially damaged Canaan's career development.  Published studio work is an integral part of obtaining employment following graduation.

58.     Issaias further retaliated by giving Canaan a C in his 18-unit studio class, which prevented her from receiving an Honors degree and put her scholarship at risk.  This grade was the lowest studio grade Canaan ever received at CMU, and upon information and belief, this grade was clearly given in retaliation for her complaining about antisemitism at CMU.  Canaan received straight As in every other class that semester.

**G.     CMU's "Solution" is to Exclude Canaan from the Architecture School's Most Important Class**

59.     In the spring 2023 semester, Canaan learned that her studio professor for that semester, Priyanka Bista, was also beholden to Arscott.  Bista was a junior professor and Arscott played an integral role in Bista securing a job at CMU.  Bista had arranged for Arscott to be present at every studio review, which was set to happen every other week.

60.     Canaan explained to Bista that she had been subject to antisemitic abuse by Arscott, that Canaan had reported Arscott, and that Canaan felt unsafe in Arscott's presence.  Bista refused any accommodation, noting that she owed her employment by CMU to Arscott and therefore, she could not raise the issue with Arscott or ask her not to attend.  Ultimately, Bista offered Canaan a "compromise": Canaan would have her work reviewed by Bista first, and then Canaan could leave studio before Arscott arrived to review her classmates' work.  This "compromise" meant that Canaan could only stay for a small portion of a four-hour studio class, the most important class for any architecture student.  Canaan never knew when Arscott would join the class—she could and did come in at any time, without warning.  The resulting anxiety triggered the migraine headaches and other physical symptoms.  Canaan therefore missed most of the class that semester.

61.     Because of Canaan's fear of Arscott, Canaan was forced to give her mid-semester presentation over Zoom instead of in-person, as Arscott was present at all of the in-person presentations.

62.     Canaan's forced absence from the most important class in her program created a clear divide, separating Canaan from her peers, socially and educationally.  Canaan became lonely, depressed, and her grades suffered.

63.     CMU punished Canaan and did nothing to Arscott or her circle of friends who further tormented Canaan.  CMU never sanctioned, punished, or even investigated Arscott or the others.

**H.     The Title IX Office Continues to String Canaan Along and Tries to Discourage Her from Filing a Formal Complaint**

64.     On December 20, 2022, Canaan informed Rosemeyer that Issaias had retaliated against her publicly, subjected her to further antisemitic abuse, and that she received a C, despite never receiving such a low grade in studio before.  Canaan also explained to Rosemeyer that the situation had been extremely upsetting and frustrating because she felt as though not a single person cared about it despite her continued reports.

65.     As if to prove the point, Rosemeyer waited a full week to respond, but ignored Canaan's reports of discrimination and retaliation and only offered to pass Canaan off to grade appeals or connect her to campus emotional support groups.

66.     Canaan continued with increasing desperation to get someone in the CMU Administration to help her.  On February 1, 2023, Canaan emailed Rosemeyer, and copied Heading-Grant and Casalegno, asking for an update on Arscott and explained that she was having to miss studio class to avoid Arscott.  She noted that the situation was extremely upsetting and detrimental to her mental health.  Casalegno replied a day later ostensibly expressing concern, but failing to take any action or to provide any update.

67.     On March 21, 2023, Canaan followed up yet again to request an update on her case.

68.     Nine days after that, on March 30, 2023, Rosemeyer gave another non-response, stating that antisemitism training was not available.  She ignored Canaan's charges and distress, and did nothing to remediate or investigate.

69.     CMU's Dean of Students, CMU's Chief Diversity Officer and Vice Provost for DEI, and the head of the Title IX Office—all the officials who were specifically charged with enforcing CMU's anti-discrimination policy and with protecting students from discrimination—were all fully aware of Canaan's well-founded reports for almost a year, and took no action.  They stonewalled, ignored her, allowed her to be cruelly and systematically abused by the faculty, permitted retaliation by the other faculty, and allowed her mental and physical health to deteriorate.

70.     CMU's officials deliberate indifference to Canaan's plight was intentional, systematic, and, upon information and belief, a direct result of CMU's ties to Qatar.   CMU established a campus in Qatar, and from 2004 to 2019 CMU reported funding from Qatar of $591,571,726.[15]   The details of CMU's contractual and other relationships with Qatar are not publicly disclosed; however they appear to motivate CMU officials not to carry out their responsibilities under the U.S. law to, among other things, protect Canaan.

71.     A November 2023 study found that "[f]rom 2015-2020, Institutions that accepted money from Middle Eastern donors, had, on average, 300% more antisemitic incidents than those institutions that did not."[16]   By accepting outsized "donations" from Qatar, CMU officials were incented not to address antisemitic and anti-Israel incidents, like the treatment of Canaan, so as not to jeopardize its lucrative relationship with Qatar.

---

[15] Charles Asher Small & Michael Bass, *Volume Two: Examining Undocumented Foreign Funding of American Universities: Implications for Education and Rising Antisemitism*, INSTITUTE FOR THE STUDY OF GLOBAL ANTISEMITISM AND POLICY, https://isgap.org/wp-content/uploads/2020/09/ISGAP-Report-Volume-II.pdf  (Sept. 2020)

[16] Charles Small, et al., *The Corruption of the American Mind: How Foreign Funding in U.S. Higher Education by Authoritarian Regimes, Widely Undisclosed, Predicts Erosion of Democratic Norms and Antisemitic Incidents on Campus* at 3, NETWORK CONTAGION RESEARCH INSTITUTE (Nov. 6, 2023), https://networkcontagion.us/reports/11-6-23-the-corruption-of-the-american-mind/.

72.     It has been reported by the Institute for the study of Global Antisemitism and Policy as follows:

> On October 7, 2023, Hamas, funded extensively by Qatar, carried out a pogrom, murdering 1,200 Israelis and kidnapping more than 230 people. The pogrom also included the torture and rape of many of its victims. This was the largest massacre of Jewish people since the Holocaust. It is also the latest attack committed by Qatari-funded terrorists. Indeed, it comes after Qatar had funded, protected and disseminated Islamist extremist ideology and organizations around the globe.[17]

73.     At the same time Qatar has exerted influence on CMU, CMU officials have permitted the dissemination and perpetuation of antisemitic and anti-Israel acts and not protected Canaan as required by CMU's written policies and the law.

**I.     CMU's Antisemitism and Retaliation Endangered Canaan's Health and Welfare and Crushed Her Dream of Becoming an Architect**

74.     These events took a serious, lasting toll on Canaan.  Canaan became severely depressed and had difficulty leaving her apartment or talking to anyone.  Canaan also suffered physical symptoms such as chronic, debilitating, and nausea-inducing migraines, requiring doctor's visits, and medication.  She incurred significant medical expenses.  Canaan felt unsafe going to class.  Canaan saw a therapist to address her deteriorating mental health.  Canaan missed many architecture lectures in the 2022-2023 academic year, and many hours of studio and review sessions as a result of the "compromise" by which she was forced to leave class out of fear of Arscott and as a result of her debilitating migraines.  Canaan was also forced to miss out on social events and one-on-one meetings hosted by Issaias, including lectures with guest speakers, group dinners, and other community events.  Canaan was also unable to participate in other architecture

---

[17] *Networks of Hate: Qatari Paymasters, Soft Power and the Manipulation of Democracy*, INSTITUTE FOR THE STUDY OF GLOBAL ANTISEMITISM & POLICY (De. 7, 2023), https://isgap.org/post/2023/12/networks-of-hate-qatari-paymasters-sof-power-and-the-manipulation-of-democracy/.

community events out of fear that Arscott might be present.  Lastly, unlike all of her other classmates, Canaan's individual work was not included in a year-end publication showcasing student work to be distributed to students, professors, and community members.  This materially prejudiced her opportunities for employment.

75.     As a result of the treatment by CMU, its professors, and administrators, and CMU's failure to address the hostile educational environment they created, Canaan did not pursue a career in architecture.

**J.     CMU Violated Its Own Policies and Purported Commitments to Investigate Discrimination**

76.     CMU's Statement of Assurance provides that CMU "does not discriminate in admission, employment, or administration of its programs or activities on the basis of race, color, national origin, sex, handicap or disability, age, sexual orientation, gender identity, religion, creed, ancestry, belief, veteran status, or genetic information." [18]

77.     CMU's Policy Against Retaliation also clearly prohibits retaliation: "It is the policy of [CMU] to protect from retaliation any individual who makes a good faith report of a suspected violation of any applicable law or regulation, university Policy or procedure, any contractual obligation of the university, and any report made pursuant to Section 9 of the [CMU] Code of Business Ethics and Conduct.  **[CMU] faculty, staff, and students shall not in any way intimidate, reprimand or take retaliatory action against any individual who makes a good faith report of a suspected violation.  Individuals who violate this policy shall be subject to**

---

[18] *Statement of Assurance*, CARNEGIE MELLON UNIVERSITY, https://www.cmu.edu/policies/administrative-and-governance/statement-of-assurance.html (last visited Dec. 8, 2023).

**appropriate disciplinary action, up to and including dismissal from the university**." (emphasis added).[19]

78.    CMU violated its procedures.

79.    The CMU Title IX Office promises in its Title IX Resource Guide that it will "review and document" a student's report of discrimination, "attempt to contact the impacted party to offer support, resources and information about options," and "in general, follow the impacted party's wishes about next steps, including if the University takes any action, such as notifying the party accused of misconduct and whether to investigate the concerns."[20]  The Title IX Resource Guide continues to describe the "supportive measures are available to all parties regardless of whether a person chooses to pursue an investigation, alternative resolution, a formal resolution, or chooses not to pursue any further process."[21]

80.    CMU denied Canaan support, resources, and information about options.  Instead, CMU pushed Canaan around from administrative office to administrative office and put up severe roadblocks to prevent Canaan from filing a formal report.

81.    The Title IX Resource Guide describes ten "[s]upportive measures… available to all parties regardless of whether a person chooses to pursue an investigation, alternative resolution, a formal resolution, or chooses not to pursue any further process": [22]

- Academic support services and accommodations;
- Academic schedule modifications (typically to separate parties);

---

[19] *Policy Against Retaliation*, CARNEGIE MELLON UNIVERSITY, https://www.cmu.edu/policies/administrative-and-governance/whistleblower.html#:~:text=Policy%20Statement&text=Carnegie%20Mellon%20faculty%2C%20staff%2C%20and,report%20of%20a%20suspected%20violation (last visited Dec. 8, 2023).

[20] *Office for Institutional Equity & Title IX, Resource Guide & Information* at 2, CARNEGIE MELLON UNIVERSITY (updated Feb. 2023), https://www.cmu.edu/title-ix/iex---resource-guide-updated-2023.pdf.

[21] *Id.* at 4.

[22] *Id.*

- Work schedule or job assignment modifications (for university employment);
- Changes in on-campus work or university housing location;
- On-campus counseling services and/or assistance in connecting to community-based counseling services;
- Assistance in connecting to community-based medical services;
- No contact agreements (agreements between parties to stop communication or other interaction with one another);
- Temporarily limiting an individual's access to certain university facilities or activities;
- Information about and/or assistance with obtaining personal protection orders;
- Leaves of absences;
- Increased monitoring and security of certain areas of the campus;
- When appropriate, escort/transportation assistance; or
- A combination of any of these measures.[23]

82.    CMU failed to provide Canaan with *any* supportive measures.  The only "accommodation" CMU provided to Canaan was to direct her to leave her important four-hour studio classes before Arscott would arrive.

83.    Despite Canaan following CMU's policies and reporting the antisemitism, hostile educational environment, and retaliation to CMU's Title IX Coordinator at the Office for Institutional Equity and Title IX, the Vice Provost for DEI and Chief Diversity Officer, and the Vice President for Student Affairs and Dean of Students, CMU failed to comply with its own written policies in response.  CMU violated the following internal procedures:

- CMU's Title IX Resource Guide dictates that upon receiving a report of discrimination, the Office for Institutional Equity and Title IX will "attempt to contact the impacted party to offer support, resources and information about options," and "follow the impacted party's wishes about next steps";[24]

- CMU's website titled "How to Report and Options for Resolution" promises that when a report is made to the Office for Institutional Equity and Title IX, which is done "simply by emailing or calling the Office" or "contacting any of the individuals or organizations listed," which includes the Office of the Dean of Student Affairs, "someone from the Institutional Equity and Title IX Office

---

[23] *Id.*

[24] *Id.*

22

will reach out to the impacted party and provide them with information about the supportive measures available, as well as options for resolution and next steps. . . . ***You choose what happens next*** . . . . We will make sure that you understand your options, and what happens next is up to you." (emphasis in original);[25]

- CMU's Procedures for Alleged Violations of the Statement of Assurance provides that upon receiving a report of discrimination, various offices, including the Office for Institutional Equity and Title IX, may decide "to initiate a formal complaint based on a report received . . . or other information that comes to the attention of the Office";[26]

- CMU's Procedures for Alleged Violations of the Statement of Assurance provides that upon receiving a report of discrimination "that could constitute a violation of both the Statement of Assurance and another university policy or policies, the university, in its discretion, will determine which policy or policies and procedures apply and whether action will be taken under multiple policies";[27]

- CMU's Procedures for Alleged Violations of the Statement of Assurance further provides that "[a]fter a formal complaint is filed, the Office for Institutional Equity and Title IX will review the formal complaint to determine whether the alleged misconduct, if true, would meet the definition of Discriminatory Conduct," and if it finds that it is not met, the complaint "will be dismissed but, when appropriate, referred for review under another applicable university policy, including the University's Bias protocol, and may merit university response through education, informal mediation, etc."[28]

84.    Canaan was discouraged from filing a formal complaint by CMU's administration because Rosemeyer convinced Canaan that it would be too much work for everyone involved who would have to be interviewed and potentially testify, and further, since she was graduating soon, there was nothing that could be done.

---

[25] *How to Report and Options for Resolution*, CARNEGIE MELLON UNIVERSITY, https://www.cmu.edu/title-ix/how-to-report-+-options-for-resolution/index.html (last visited Dec. 8, 2023).

[26] *Procedures for Alleged Violations of the Statement of Assurance* at 2, CARNEGIE MELLON UNIVERSITY (updated July 29, 2022), https://www.cmu.edu/policies/forms-and-documents/soa-violations.pdf.

[27] *Id.*

[28] *Id.* at 3.

85.     Contrary to Rosemeyer's assertions, nothing in CMU's Procedures for Alleged Violations of the Statement of Assurance, its Title IX Resource Guide, or its "How to Report and Options for Resolution" website suggests that CMU's responsibilities to investigate and respond to complaints end when a complainant graduates.

86.     CMU's Procedures for Alleged Violations of the Statement of Assurance, CMU's Title IX Resource Guide, and CMU's "How to Report and Options for Resolution" contractually guarantee a right to a specific type of investigation in the event that a student experiences discrimination, harassment, and/or retaliation, misconduct that violates CMU's Statement of Assurance.

87.     CMU did not notify Canaan of any of these important policies and procedures. Notwithstanding the existence of these important policies and procedures, CMU failed to take the appropriate measures to implement or abide by them.

**K.     Canaan is a Member of a Protected Class Within the Scope of Title VI**

88.     The U.S. Department of Education Office for Civil Rights ("OCR") has made clear that antisemitic harassment can trigger responsibilities under Title VI of the Civil Rights Act of 1964 when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices.   This includes Jewish ancestry and ethnicity.  *See* Dear Colleague Letter from Russlynn Ali, Assistant Secretary for Civil Rights, Office for Civil Rights, U.S. Dep't of Education (Oct. 26, 2010); Dear Colleague Letter from Catherine E. Lhamon, Assistant Secretary for Civil Rights, Office for Civil Rights, U.S. Dep't of Education (May 25, 2023) ("The May 25, 2023 OCR Letter") ("Title VI protects all students, including students who are or are perceived to be Jewish, from discrimination based on race, color, or national origin…"); Dear Colleague Letter from Catherine E. Lhamon, Assistant Secretary for Civil Rights, Office for Civil Rights, U.S. Dep't of Education (Aug. 24, 2023) ("The

August 24, 2023 OCR Letter") ("Although Title VI does not cover discrimination based on religion, it does cover discrimination based on a person's actual or perceived shared ancestry or ethnic characteristics, which may include characteristics associated with specific religious groups").

89.     On September 28, 2023, the Biden Administration noted in a Fact Sheet that "eight federal agencies clarified—for the first time in writing—that Title VI of the Civil Rights Act of 1964 prohibits certain forms of antisemitic, Islamophobic, and related forms of discrimination in federally funded programs and activities."  It also reiterated that "Title VI of the 1964 Civil Rights Act applies to all programs and activities supported by federal financial assistance.  Thus, these protections are wide-ranging and provide important tools to prevent and curb discrimination."[29]

90.     Title VI of the Civil Rights Act applies to any "program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

91.     CMU receives federal financial assistance from the United States Department of Education and is therefore subject to suit under Title VI.

92.     At all relevant times, CMU faculty, staff, administration, and other employees and/or affiliates ("CMU Agents") were acting within the scope of their employment and/or at the direction and control of CMU.  Moreover, at all relevant times, appropriate CMU Agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering CMU liable for the conduct of its agents.

---

[29] THE WHITE HOUSE, FACT SHEET: BIDEN-HARRIS ADMINISTRATION TAKES LANDMARK STEP TO COUNTER ANTISEMITISM (Sept. 28, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/09/28/fact-sheet-biden-harris-administration-takes-landmark-step-to-counter-antisemitism/ (last visited Dec. 8, 2023).

93.     Discrimination against Jews is prohibited under Title VI, as reflected in the written policies of the Department of Education's Office for Civil Rights.

94.     Canaan is Jewish and of Israeli descent, and therefore, is a member of a protected class within the scope of Title VI's protections.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000D (DIRECT DISCRIMINATION)

95.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 94 above as if fully set forth herein.

96.     Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

97.     Canaan is Jewish and of Israeli descent, and therefore, is a member of a protected class within the scope of Title VI's protections.

98.     Canaan, who at all relevant times paid tuition to CMU, was qualified to continue the pursuit of her architectural education and career.

99.     Canaan was denied the benefits of educational and other programs at CMU.

100.     As a direct result of her being a member of a protected class, Canaan suffered several adverse actions while at CMU and was subjected to discrimination by CMU based on her Jewish and Israeli ancestry and religion.  CMU violated Title VI by subjecting Canaan to a series of intentional hostile acts and adverse actions while she was in pursuit of her education.  These

acts were designed to deprive her of the benefits of her education and derail her academic pursuit because of her religion and national origin.

101.    CMU directly and intentionally discriminated against Canaan.  This direct and intentional discrimination includes, but is not limited to: Arscott's antisemitic comments; Arscott intentionally sending an antisemitic and anti-Israel blog to Canaan in response to Canaan reporting her antisemitic comments; Bista instructing Canaan to leave class before Arscott arrived; Issaias retaliating against Canaan after she reported antisemitism by lowering her grades, refusing to meet one-on-one, and excluding only her work from a booklet displaying the final projects of all of his other students; and CMU's deliberate indifference and/or inadequate investigation and response to Canaan's continued reports of antisemitic comments, hostile educational environment, and retaliation.

102.    Canaan was treated differently from her similarly situated non-Jewish, non-Israeli classmates.  There was no legitimate, non-discriminatory reason for these adverse actions.

103.    CMU also failed to address other instances of discrimination that occurred on its campus and reported to university administrators, including but not limited to the failure to prevent the intimidation of and discrimination against Canaan by other CMU students, faculty, and staff. CMU had knowledge of and was deliberately indifferent to a hostile educational environment that was severe, persistent, and pervasive.

104.    The discrimination deprived Canaan of equal access to educational opportunities and benefits provided to other students at CMU.  As a result of the discrimination she faced, Canaan was unable to get the full value of a college degree for which she worked for five years.

105.    These discriminatory acts also took a toll on Canaan's mental and physical well-being.  Canaan was forced to miss countless hours of classes, group events, and other educational and professional experiences.

106.    CMU failed to cure or otherwise adequately address this discrimination against Canaan and instead acted with deliberate indifference towards Canaan.

107.    CMU's actions and conduct had, and continue to have, a disparate impact upon Canaan.

108.    As a direct and proximate result of CMU's and its professors' actions and inactions, Canaan has suffered—and will continue to suffer—from physical symptoms, such as debilitating and nausea-inducing migraines for approximately 22 days of every month, requiring medical care and treatment.

109.    As a direct and proximate result of CMU's actions and inactions, Canaan has suffered—and will continue to suffer—economic losses in the form of out-of-pocket medical expenses for medical care and treatment.

110.    As a direct and proximate result of CMU's actions and inactions, Canaan was deprived of access to educational opportunities and benefits, including the ability to receive an education in an environment free from discrimination and intimidation, and the loss of significant class time and group learning, which further impacted Canaan's academic performance and ultimately has caused her to suffer a loss of career earnings.

111.    As a direct and proximate result of CMU's direct instruction to Canaan to leave class early in a critical 18-credit course in order to avoid discrimination and hostile treatment, Canaan suffered a loss of education, educational opportunities and benefits, and monetary damages in the form of loss of tuition paid for the countless hours of class she was forced to miss.

## COUNT II

## VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000D

## (HOSTILE EDUCATIONAL ENVIRONMENT)

112.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 94 above as if fully set forth herein.

113.    The May 25, 2023 OCR Letter states, "Schools must take immediate and appropriate action to respond to harassment that creates a hostile environment." May 25, 2023 OCR Letter at 1.

114.    The August 24, 2023 OCR Letter notes:

OCR could find a Title VI violation in its enforcement work if: (1) a hostile environment based on race existed; (2) the school had actual or constructive notice of the hostile environment; and (3) the school failed to take prompt and effective steps reasonably calculated to (i) end the harassment, (ii) eliminate any hostile environment and its effects, and (iii) prevent the harassment from recurring.  OCR interprets Title VI to mean that the following type of harassment creates a hostile environment: unwelcome race-based conduct that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive, that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment). . . .To redress a hostile environment, a school has a legal duty to take prompt and effective steps that are reasonably calculated to: (1) end the harassment, (2) eliminate any hostile environment and its effects, and (3) prevent the harassment from recurring.

August 24, 2023 OCR Letter at 4–6.

115.    Canaan is Jewish and of Israeli descent, and therefore, is a member of a protected class within the scope of Title VI's protections.

116.    As a direct result of her being a member of a protected class, Canaan suffered several adverse actions while at CMU and has been subjected to discrimination by CMU based on her Jewish and Israeli ancestry and religion.

117.    CMU had actual knowledge of the discrimination that Canaan endured, and intentionally caused and/or was deliberately indifferent to such discrimination, in material part due to CMU's relationship with Qatar.

118.    Canaan has been denied the benefits of educational and other programs at CMU.

119.    Canaan faced harassment because of her race, national origin, and religion and was subject to a hostile educational environment.  CMU had actual knowledge of these incidents and was deliberately indifferent to them because their response to Canaan's repeated reports was either inadequate, delayed, or nonexistent.  Canaan endured a pattern of antisemitic remarks creating a hostile environment that was reported to administrators and staff at CMU and nothing was done to rectify the discrimination.

120.    The harassment was so severe and objectively offensive that it deprived Canaan of access to educational benefits and opportunities provided by CMU.  Specifically, Canaan missed (i) many architecture lectures; (ii) many hours of studio, a very important 18-credit course; (iii) many hours of review sessions; (iv) other classes due to fear of being on campus; (v) social events and one-on-one meetings hosted by Issaias; and (vi) all architecture community events from fall 2022 through graduation out of fear that Arscott might be present.  As a result, Canaan did not pursue an architecture job after college, and could not pursue a thesis program because it was run by Arscott.

121.    As a direct and proximate result of CMU's actions and inactions, Canaan has suffered—and will continue to suffer—from physical symptoms, such as debilitating and nausea-inducing migraines, requiring medical care and treatment.

122.    As a direct and proximate result of CMU's and its professors' actions and inactions, Canaan has suffered—and will continue to suffer—economic losses in the form of out-of-pocket medical expenses for medical care and treatment.

123.    As a direct and proximate result of CMU's and its professors' actions and inactions, Canaan was deprived of access to educational opportunities and benefits, including the ability to receive an education in an environment free from discrimination and intimidation, and the loss of significant class time and group learning, which further impacted Canaan's academic performance and ultimately has caused her to suffer a loss of career earnings.

124.    As a direct and proximate result of CMU's direct instruction to Canaan to leave class in order to avoid discrimination and hostile treatment, Canaan suffered a loss of education, educational opportunities and benefits, and monetary damages in the form of loss of tuition paid for each class she was forced to miss.

## COUNT III

## VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000D (RETALIATION)

125.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 94 above as if fully set forth herein.

126.    The Department of Education promulgates a regulation that provides that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part."  34 C.F.R. § 100.7(e).

127.    Canaan is Jewish and of Israeli descent, and therefore, is a member of a protected class within the scope of Title VI's protections.

128.     Canaan engaged in protected activity by reporting the instances of discrimination to CMU officials and employees as described above.

129.     CMU was aware of Canaan's protected activity.

130.     Canaan had a reasonable, good faith belief that violations of Title VI existed.

131.     CMU subjected Canaan to material adverse actions as a result of her protected activity of reporting discrimination at CMU.

132.     These occurred contemporaneously with, or after, Canaan's reports of discrimination.

133.     After Canaan reported the antisemitic incidents involving Issaias's close friend Arscott, and as a result of these reports, Issaias repeatedly belittled Canaan both privately and publicly.  Before Canaan reported these incidents, Issaias praised Canaan's work product.  But immediately after Canaan confided in Issaias and revealed that she had made reports of antisemitism, Issaias sharply turned against Canaan, going so far as to publicly blame Canaan for another student's problems in the studio on a project that Canaan was not even working on.  He subjected her to continual abuse, telling Canaan that she had failed him all semester, and abruptly walking out of their one-on-one meetings.  He told Canaan that she needed to "stop acting like a victim" and that he was "not there to fight her battles for her."  Issaias also complained that Canaan was "calling all of us antisemites" and said that he "cannot be an advocate for the Jews."  He acted aggressively towards Canaan in front of her classmates, to the point where some of her classmates asked her what happened and why Issaias treated her that way.

134.     Issaias refused to work with Canaan, skipping over her when he would work with other students one-on-one.

135.    Issaias also made a booklet that showed all of the students' final projects, to be distributed to students, professors, and community members, but excluded Canaan's individual work.

136.    Issaias gave her a C in his class, which was lower than that of the other classmates in her group project, and dismissed her attempts to meet one-on-one, refusing her the same attention and treatment that he gave every other student.  Canaan discussed these experiences with studio professor Priyanka Bista, who then also retaliated against Canaan by telling her that her only option to avoid Arscott in Bista's class was to leave before Arscott arrived.

137.    As a direct and proximate result of CMU's actions and inactions, Canaan has suffered—and will continue to suffer—from physical symptoms, such as debilitating and nausea-inducing migraines, requiring medical care and treatment.

138.    As a direct and proximate result of CMU's actions and inactions, Canaan has suffered—and will continue to suffer—economic losses in the form of out-of-pocket medical expenses for medical care and treatment.

139.    As a direct and proximate result of CMU's actions and inactions, Canaan was deprived of access to educational opportunities and benefits, including the ability to receive an education in an environment free from discrimination and intimidation, and the loss of significant class time and group learning, which further impacted Canaan's academic performance and ultimately has caused her to suffer a loss of career earnings.

140.    As a direct and proximate result of CMU's direct instruction to Canaan to leave each class early in order to avoid discrimination and hostile treatment, Canaan suffered a loss of education, educational opportunities and benefits, and monetary damages in the form of loss of tuition paid for each class she was forced to miss.

## COUNT IV

## BREACH OF CONTRACT

141.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 94 above as if fully set forth herein.

142.    The relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract.

143.    Canaan had a contractual relationship with CMU.

144.    As part of Canaan's enrollment at CMU, Canaan agreed to pay CMU tuition, and abide by CMU's policies.  In return, CMU agreed to accept Canaan's tuition money in exchange for providing her a discrimination-free educational environment, including by abiding by and adequately enforcing CMU's policies regarding discrimination.

145.    CMU's Statement of Assurance, CMU Policy Against Retaliation, Title IX Resource Guide, and CMU Procedures for Alleged Violations of the Statement of Assurance are specifically designated and discrete promises.  These policies and procedures are sufficiently definite and contractually guarantee a right to a specific type of investigation, support, or sanctions in the event that a student experiences misconduct that violates CMU's Statement of Assurance.

146.    CMU's Procedures for Alleged Violations of the Statement of Assurance contains enforceable contractual provisions regarding CMU's review of claims of discrimination and retaliation and whether they merit university response through an investigation or informal resolution.

147.    CMU's Title IX Office promises that it will "review and document" a student's report of discrimination, "attempt to contact the impacted party to offer support, resources and information about options," and "in general, follow the impacted party's wishes about next steps,

34

including if the University takes any action, such as notifying the party accused of misconduct and whether to investigate the concerns."[30]

148.    CMU engaged in behavior designed to discourage and dissuade Canaan from seeking to have her complaint of antisemitism, hostile educational environment, and retaliation fully investigated pursuant to CMU's Procedures for Alleged Violations of the Statement of Assurance.

149.    CMU breached its duties under the Procedures for Alleged Violations of the Statement of Assurance and Title IX Resource Guide by failing to review Canaan's reports of discrimination and follow her wishes about next steps.

150.    CMU did not perform its obligations under its Procedures for Alleged Violations of the Statement of Assurance by failing to take measures to prevent and punish the discriminatory and retaliatory conduct that Canaan endured and provide Canaan with supportive measures as promised in the Title IX Resource Guide.

151.    CMU did not perform its obligations under its agreement with Canaan to accept her tuition in exchange for a discrimination-free educational environment.

152.    By breaching its contractual obligations, CMU failed to meet Canaan's reasonable expectations of the equal educational benefits to which she is entitled.

153.    The breach of the provisions relating to nondiscrimination are of such a kind that serious emotional disturbance was a particularly likely result and, in fact, did result.  This is because the inability to address antisemitic and anti-Israel discrimination in teens and young adults would make any Jewish student, like Canaan, suffer from severe mental anguish, manifesting itself

---

[30] *Office for Institutional Equity & Title IX, Resource Guide & Information* at 2, Carnegie Mellon University (updated Feb. 2023), https://www.cmu.edu/title-ix/iex---resource-guide-updated-2023.pdf.

physically, and with anxiety and depression.  This made it impossible for Canaan to pursue the education she had contracted for.

154.     As a direct and proximate result of CMU's numerous breaches, Canaan has suffered—and will continue to suffer—from damages in the form of severe and lasting psychological trauma and injury, embarrassment, humiliation, mental anguish, and other incidental and consequential damages and expenses.  As a result of this, Canaan also suffered physical symptoms, requiring doctor's visits, an almost two-year battle with debilitating and nausea-inducing migraines, depression, isolationism, and anxiety, and treatment, including medications.

155.     As a direct and proximate result of CMU's numerous breaches, Canaan has suffered—and will continue to suffer—economic losses in the form of out-of-pocket medical expenses for medical care and treatment; a deprivation of access to educational opportunities and benefits, including the ability to receive an education in an environment free from discrimination and intimidation, and the loss of significant class time and group learning, which further impacted Canaan's academic performance and ultimately has caused her to suffer a loss of career earnings; and a loss of tuition paid for each class she was forced to miss due to her constant fear that Arscott would arrive.

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

156.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 94 above as if fully set forth herein.

157.     CMU's extreme and outrageous intentional actions in discriminating against Canaan on the basis of her national origin and religion resulted in serious harm.

158.     CMU intentionally and/or recklessly subjected Canaan to severe emotional distress manifesting in significant physical injuries by purposefully evading their legal obligation to take

prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

159.    Additionally, Arscott intentionally and outrageously subjected Canaan to severe emotional distress manifesting in significant injuries by purposefully discriminating against Canaan.

160.    At all relevant times, Arscott was acting within the scope of her employment and/or at the direction and control of CMU.

161.    Moreover, CMU was made aware of and took no action against Arscott, thereby ratifying her conduct.

162.    As a direct result of CMU's and the professors' outrageous behavior, Canaan suffered from (and continues to suffer from) severe and lasting psychological trauma and injury, embarrassment, humiliation, mental anguish, and other incidental and consequential damages and expenses.  As a result of this, she also suffered physical symptoms, requiring doctor's visits, debilitating and nausea-inducing migraines, depression, isolationism, and anxiety, and treatment, including medications.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

        a.    Entry of judgment against CMU on all Counts;

        b.    Award of monetary damages, including, without limitation, for her loss of educational opportunities, tuition payments, out-of-pocket costs for therapy, counseling and/or medical, psychological and psychiatric care required as a result of CMU's conduct, costs to be paid for further therapy, counseling and/or medical, psychological and psychiatric care required as a result of CMU's conduct, and lost career earnings;

c.     Emotional damages for intentional infliction of emotional distress and breach of contract, as Canaan suffered and continues to suffer from severe and lasting emotional damages: psychological trauma and injury, embarrassment, humiliation, and mental anguish and injury;

d.     Punitive damages;

e.     Injunctive relief preventing CMU from violating Title VI;

f.     An award of attorneys' fees and costs under 42 U.S.C. § 1988; and

g.     Such other and further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Dated: December 13, 2023                    SIMPSON THACHER & BARTLETT LLP

By: /s/ *Bryce L. Friedman*

Bryce L. Friedman*
(bfriedman@stblaw.com)
Michael H. Torkin*
(michael.torkin@stblaw.com)
Zachary J. Weiner*
(zachary.weiner@stblaw.com)
Alexander C. Rabinowitz*
(alexander.rabinowitz@stblaw.com)

425 Lexington Avenue
New York NY 10017
Tel: (212) 455-2000

THE LAWFARE PROJECT

By: /s/ *Ziporah Reich*

Ziporah Reich*
(Ziporah@theLawfareProject.org)

633 Third Avenue, 21st Floor
New York, NY 10017
Tel: (212) 339-6995

*Attorneys for Plaintiff Yael Canaan*

*pro hac vice* application pending